IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTOPHER J. WARE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-629-SLR |
| | ) |
| POLICE OFFICER KIMBERLY DONAHUE and POLICE OFFICER TODD RILEY, | ) ) ) |
| | ) |
| Defendants. | ) |

Christopher J. Ware, Wilmington, Delaware. Pro Se Plaintiff.

Daniel Foster McAllister, Esquire, City of Wilmington Law Department, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: June 19, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Christopher J. Ware ("plaintiff"), who proceeds pro se, filed this lawsuit alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983[1] and raising supplemental state claims. Presently before the court is defendants' motion to dismiss the complaint or, in the alternative, for summary judgment and plaintiff's cross-motion for summary judgment. (D.I. 44, 47) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed, the court will deny the motions.

## II. BACKGROUND

Plaintiff's claims arise from actions taken on July 25, 2008 by defendants Wilmington police officers Kimberly Pfaff (née Donohue) ("Pfaff")[2] and Todd Riley ("Riley") during their investigation of a suspected break-in at plaintiff's residence following the triggering of an alarm system. Plaintiff rented a third-floor room from the owner of property located on Ninth Street in Wilmington, Delaware. The property had a security alarm and that night it activated. Plaintiff heard the alarm, went downstairs and deactivated it, returned to his bedroom and, before he fell asleep, the security company telephoned.[3] Plaintiff told the security company that it was a "false alarm" and that he would contact the owner. The owner told plaintiff that he would contact his girlfriend and have her look into the matter. The owner's girlfriend telephoned and told plaintiff

---

[1] When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

[2] The court docket does not indicate that Pfaff has answered the complaint.

[3] According to Riley, the security company called after the police arrived.

that the property's front door was ajar, and plaintiff asked her to close it. She also indicated that she saw Wilmington Police Department cruisers driving down Ninth Street. At that point plaintiff considered the matter over and returned to sleep. (D.I. 46 at A5, A9, A14-15, A20-22-23, A26; D.I. 51 at 12)

In response to the alarm, three or four Wilmington police officers, including defendants, entered the premises through a door that was ajar. The police announced their presence and slowly searched the premises for burglary suspects or other signs of crime. Plaintiff, who slept with his bedroom door locked for privacy, became aware of the police when he heard radio activity and people walking in the third-floor hallway. Plaintiff testified that, although he heard the police activity, he did not know if someone else had come into the home so he though it best not to announce himself. The police officers came to the final bedroom (plaintiff's) which was the only door in the house that was secured. According to Pfaff, the officers knocked on bedroom's door and announced "Wilmington Police." Plaintiff testified that he never heard the word "police" shouted. The officers kicked in the door with weapons drawn, said "hands," asked plaintiff who he was, and turned on the bedroom light. Plaintiff was lying on a mattress on the floor, covered with a blanket. The parties disagree whether plaintiff showed his hands. Regardless, the officers removed the blanket from plaintiff who was naked.[4] The bedroom was "sloppy," but there was nothing in the room, such as weapons or other items, that might be construed as threatening. In dispute is whether plaintiff told

---

[4]There was a Tickle Me Elmo doll in the room. Riley states that the doll was covering plaintiff's crotch, while plaintiff states that he never touched the doll. The police officers found the presence of the doll "suspect." (D.I. 46 at A94,96; D.I. 51 at 10)

2

the police his name.  Plaintiff was ordered to stand and he did.  Pfaff recognized plaintiff and told the officers that plaintiff was a bail bondsman.[5]  Plaintiff and Riley recognized each other from a court hearing they had attended, although Riley did not know plaintiff's name or where he lived.  (D.I. 46 at A28-30, A32, A36-38, A46-47, A49, A79, A81, A95-100; D.I. 51 at 5-6, 10-11, 34; D.I. 54 at 11-13, 23, 35, 41, 63)

Plaintiff testified that he asked to dress but he received no response, and Riley does not recall when plaintiff asked to dress.  According to Riley, one of the officers asked for plaintiff's identification.  According to plaintiff, he handed over a new driver's license to one of the police officers, that contained the address of the property in question.  Pfaff does not recall that plaintiff provided his driver's license and testified that, because he would not provide his identity, she went into his wallet (described by plaintiff as a business card holder) and removed the license.  Pfaff later testified that she did not recall how she obtained the license - if she picked up the wallet from the floor or if someone handed it to her, but she knew the license was inside the wallet or something that held the identification.  Pfaff testified that if a person was not a threat to her, she would ask them to retrieve their own wallet or their identification but, if they were a threat, then for safety reasons she would be allowed to go into the wallet.  Riley testified that plaintiff held the wallet up in the air, and Pfaff took it outside to search for some sort of identifying document.  Pfaff testified that another officer radioed in the information on the driver's license and ran a check on it.  Riley testified that somehow

---

[5] At that time, plaintiff no longer worked in the bail bondsman industry.  Pfaff testified that she remembered escorting plaintiff from a courthouse incident.  (D.I. 54 at 23-4)

Pfaff verified plaintiff's name and that he lived at the premises.[6] (D.I. 45 at A39-40; D.I. 51 at 11-12, 16, 36; D.I. 54 at 32, 45, 56, 57-60)

According to plaintiff, a male police officer took plaintiff's driver's license and went next door to speak to a neighbor to corroborate plaintiff's identity. The officer returned and indicated that the neighbor verified that plaintiff lived at the property on Ninth Street. Also according to plaintiff, while the officer was next door, Pfaff took plaintiff's wallet, went through its contents, took the business cards from it, and threw them on the floor. Pfaff does not recall looking at other documents or tossing any of the items from the wallet on the floor. (D.I. 46 at A51, A100; D.I. 54 at 43, 63)

After the police officer returned and verified that plaintiff resided at the house on Ninth Street, Riley asked plaintiff his name several times. Plaintiff put his head down, and shook it "no," and did not answer. Plaintiff testified that Riley then placed his forearm around plaintiff's neck (plaintiff refers to this as a trachea hold), pushed plaintiff to the ground, and straddled him.[7] Riley denies assaulting plaintiff or touching plaintiff other than to pull the blanket from him. The parties agree that plaintiff was told he would be arrested if he could not be identified. Until the time that plaintiff was identified, Riley perceived plaintiff as a threat given the alarm, not knowing plaintiff, and plaintiff's uncooperativeness. According to Pfaff, the investigation ended after someone spoke

---

[6]At some point in time (plaintiff is unsure of the chronology of events but believes the call was made before the police officer went next door), plaintiff telephoned the property owner and told him that the police were in the house. Plaintiff handed the telephone to one of the police officers so that the officer could speak to the owner. (D.I. 46 at A44, A46, A53)

[7]According to plaintiff, at this point he was still naked. (D.I. 46, A56)

4

with the owner of the property. After the incident, plaintiff testified that he dressed, while Pfaff was "pretty sure" that plaintiff was allowed to dress earlier. The police left because they no longer considered plaintiff a suspect. Plaintiff did not seek medical treatment as a result of the incident. (D.I. 46, A55-56, 59, A82-84, A88; A51, 18, 29-30, 42, 58; D.I. 54, 14, 44)

## III. MOTION TO DISMISS

Defendants move to dismiss pursuant to Fed. R. Civ. P. 37(b)(2)(A) on the grounds that plaintiff failed to comply with a discovery order. Plaintiff opposes the motion. Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure authorizes a district court to impose sanctions, including dismissing an action, should a party fail to obey an order to provide or permit discovery. *Wallace v. Graphic Mgmt. Associates*, 197 F. App'x 138, 141 (3d Cir. 2006) (unpublished); *see also* Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii). "[D]ismissal is a harsh remedy and should be resorted to only in extreme cases," but "[d]istrict court judges, confronted with litigants who flagrantly violate or ignore court orders, often have no appropriate or efficacious recourse other than dismissal of the complaint with prejudice." *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992) (internal quotations omitted).

In order to determine whether dismissal is an appropriate sanction, the court weighs six factors as set forth in *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984), as follows: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than

5

dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. *Poulis*, 747 F.2d at 867.

Plaintiff's deposition was taken on April 20, 2012. He testified that there was videographic evidence of the incident, recorded on a camera phone. During his deposition, plaintiff refused to answer questions regarding the videographic evidence, and the court was contacted for a ruling on the issue. The court advised plaintiff that if he had relevant evidence it had to be disclosed to defendants and his options did not include refusing to disclose the taped evidence. Plaintiff testified that the video evidence existed at the time of the deposition, although he was not sure if he would be able to retrieve it from the camera because the phone was inoperable. (D.I. 46, A60-74, A77-79)

Prior to the deposition, defendants had served a request for production upon plaintiff on April 12, 2012 that sought copies of any and all videotapes, audio or visual recordings taken by or prepared by plaintiff or on his behalf, in his possession or available to him concerning any aspect of the litigation. (D.I. 27, request No. 5) Plaintiff did not respond to the request. Following his deposition, defendants served a second request for production that sought "copies of all video recordings of the incident giving rise to the pending litigation, or, in the alternative, the medium on which such videographic recording is allegedly stored, whether or not such recording is currently accessible." (D.I. 31) In addition, defendants requested an inspection of "the cellular telephone which plaintiff stated contains the videographic recording of the incident giving rise to the pending litigation and which is in plaintiff's possession." (*Id.*) On August 6, 2012, plaintiff objected on the grounds of duplicity, relevance, and right to

6

privacy.[8] (D.I. 42) In addition, he stated that he was unable to access the videographic evidence because the handset that was in his possession is in disrepair, and he did not produce the items requested in the second request for production. Defendants wrote to plaintiff on June 18, 2012, again seeking a copy of the video recording or the recording device and advising plaintiff that if the items were not produced, defendants would either file a motion to compel or a motion to dismiss. (D.I. 46, A110) Defendants filed the instant motion to dismiss on September 4, 2012.

The failure to respond to discovery requests is directly attributable to plaintiff, as he proceeds pro se. Defendants are prejudiced by plaintiff's failure to comply with discovery as they are precluded both from inspecting the equipment in question and viewing a videotape recording of the incident in question. Plaintiff indicates that the information is no longer retrievable. Because plaintiff proceeds pro se and in forma pauperis, it is doubtful that monetary sanctions would be effective. At this juncture, there remain issues of fact and, therefore, it is uncertain if plaintiff's claim is meritorious. The court finds that, under the circumstances, the *Poulis* factors do not weigh in favor of the harsh sanction of dismissal. For the above reasons, the court will deny defendants' motion to dismiss pursuant to Rule 37.

## III. MOTIONS FOR SUMMARY JUDGMENT

In the alternative, defendants move for summary on the grounds that: (1) Pfaff did not engage in unconstitutional activity; (2) Riley's actions were objectively reasonable and there is no support in the record to conclude that plaintiff suffered any

---

[8]The objections are not well-taken.

physical injuries as a result of the alleged use of force; (3) defendants are entitled to qualified immunity; and (4) the case relies exclusively on plaintiff's own contradictory testimony that is not corroborated by any independent source. Plaintiff moves for summary judgment as to Pfaff on the grounds that there are no facts in dispute and for partial summary judgment as to Riley on the assault and constitutional infirmity (i.e., 42 U.S.C. § 1983) claims.[9]

## A. Standard of Review

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough

---

[9]It seems that plaintiff refers to his § 1983 claims as constitutional infirmities.

8

evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322. The same standards and burdens apply on cross-motions for summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

### B. Fourth Amendment

Both plaintiff and Pfaff move for summary judgment on the Fourth Amendment unlawful search and seizure issue. For purposes of defendants' motion only, they do not deny that Pfaff searched the wallet. (*See* D.I. 45 at 3)

"[T]he Fourth Amendment protects two types of expectations, one involving searches, and the other seizures. A search occurs when an individual's reasonable expectation of privacy is infringed. A seizure of property occurs where there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty.*, 506 U.S. 56, 63 (1992) (internal quotations and citations omitted). It is a basic principle of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez,* 540 U.S. 551, 559 (2004) (internal quotation marks omitted). "[W]arrants are generally required to search a person's home

9

or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."[10] *Mincey v. Arizona,* 437 U.S. 385, 393-394 (1978) Regardless of whether an exception applies, a warrantless search generally must be supported by probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).

Upon review of the record, the court concludes that there remain issues of fact and, thus, summary judgment on the Fourth Amendment claim is not proper for any party. Defendants contend that no reasonable jury could find that exigent conditions did not exist given that plaintiff did not reveal and identify himself to police, remained behind a locked bedroom door, and refused to cooperate with the police officers. Defendants, however, omit that Pfaff recognized plaintiff, that according to plaintiff he provided his name, told the officers that he lived in the residence and, as best as can be determined from the chronology of events (keeping in mind that neither party is clear in that regard), Pfaff went through plaintiff's wallet after she knew plaintiff's correct name and that the address on the driver's license was identical to the address where plaintiff said he lived and where the police officers responded. While there is some evidence to suggest that plaintiff consented to this intrusion as Riley testified that plaintiff held up the wallet (as if to hand it to officers), there is other evidence that plaintiff provided the officers his license and, regardless, Pfaff retrieved the wallet from the floor and went through its

---

[10]Exigent circumstances exist where "officers reasonably . . . believe that someone is in imminent danger." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996). For example, a search may be justified based on exigent circumstances by "hot pursuit of a fleeing felon," "imminent destruction of evidence," or "the need to prevent a suspect's escape." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

contents. Finally, a reasonable jury could infer either that: (1) at the time Pfaff searched the wallet, the bedroom had been secured by the presence of numerous law enforcement officers, and plaintiff did not present any immediate threat to the officers' safety given that he was standing naked in a room with no weapons and nothing prevented the officers from seeking plaintiff's consent for the search of his license or perhaps seeking plaintiff's permission to retrieve his license; or (2) that plaintiff's failure to cooperate with the officers placed defendants on alert and in fear for their safety.

### C. Excessive Force and Assault

Defendants move for summary judgment on the excessive force claim on the grounds that Riley's actions were objectively reasonable and plaintiff sustained no injury. For purposes of their motion, defendants do not deny that Riley placed plaintiff in a trachea hold. (See D.I. 45 at 3) Plaintiff moves for partial summary judgment with respect to the counts of assault and constitutional infirmity (i.e., § 1983 excessive force claim).

"[C]laims that law enforcement officers have used excessive force . . . in the course of an . . . investigatory stop . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004); *Mosley v. Wilson*, 102 F.3d 85, 95 (3d Cir. 1996). The reasonableness of the officer's use of force is measured by "careful attention to the facts and circumstances of each particular case,

11

including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. It is well-established that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Under the law of the Third Circuit, the minor degree of a plaintiff's injury, while relevant to the totality of the circumstances, cannot on its own serve as a complete defense to an excessive force claim. *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002).

Upon review of the record and viewing the facts in the light most favorable to plaintiff with respect to defendants' motion for summary judgment, the court concludes that issues of fact remain as to whether Riley acted reasonably when he placed plaintiff in a trachea hold, given that plaintiff was naked, there were no weapons in sight, and there is no evidence that plaintiff attempted to flee or actively resisted the police officers. At worst, plaintiff did not cooperate by providing his name to the police officers. With respect to plaintiff's motion for summary judgment on the § 1983 issue, there also remain disputed issues of fact. Plaintiff testified that Riley placed him in a trachea hold, while Riley testified he did not touch plaintiff.

Plaintiff also moves for summary judgment on the assault issue on the grounds that there was no objective reason for Riley to threaten him with a deprivation of liberty. Under Delaware law, an assault is the attempt by a person, in a rude and revengeful manner, to do an injury to another person, coupled with the present ability to do it. *Lloyd v. Jefferson*, 53 F. Supp. 2d 643, 672 (D. Del. 1999). The court finds that the

record does not support summary judgment on plaintiff's behalf on the assault issue.

Therefore, the court will deny plaintiff's cross-motion for summary judgment.

## V. CONCLUSION

For the reasons discussed above, the court will deny defendants' motion to dismiss and, in the alternative, motion for summary judgment (D.I. 44).[11] The court will also deny plaintiff's cross-motion for summary judgment (D.I. 47).

An appropriate order will be entered.

---

[11] Given there remain material factual disputes, it is inappropriate to grant summary judgment on the issue of qualified immunity. See Curley v. Klem, 499 F.3d 199, 208, 211 n.12 (3d Cir. 2007). Similarly, the court does not address defendants' final ground for relief having found that there remain genuine issues of material fact.