IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTOPHER J. WARE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-629-SLR |
| | ) |
| POLICE OFFICER TODD RILEY | ) |
| and POLICE OFFICER KIMBERLY | ) |
| DONAHUE, | ) |
| | ) |
| Defendants. | ) |

Christopher J. Ware, Wilmington, Delaware. Pro Se Plaintiff.

Daniel Foster McAllister, Esquire, City of Wilmington Law Department, Wilmington, Delaware. Counsel for Defendants.

**OPINION**

Dated: March 12, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Christopher J. Ware ("plaintiff"), who proceeds pro se, filed this lawsuit alleging violations of his constitutional rights pursuant to 42 U.S. C. § 1983[1] and raising supplemental state claims for actions taken during the investigation of a suspected break-in at plaintiff's residence following the triggering of an alarm system. A bench trial was held November 20 and 21, 2013. (D.I. 94, 95) The court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367(a). Having considered the documentary evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT

### A. The Parties

1. Plaintiff Christopher J. Ware is a citizen of the State of Delaware who rented a room at 608 W. 9th Street, Wilmington, Delaware on the date in question.[2] (D.I. 2; D.I. 94 at 84:25, 110:15-18) Plaintiff is currently a student at the University of Delaware. (D.I. 94 at 109:10-12) At one time, he was a bail bonds agent. (Id. at 65:11-14)

2. Defendant Todd Riley ("Riley") currently works for the United States Drug Enforcement Administration. He formerly worked for the Wilmington Police Department

---

[1] When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

[2] There is a dispute as to the date of the occurrence. Both the complaint and answers to the complaint indicate that July 25, 2008, is the date in question. (*See* D.I. 2, 15, 61) At trial, defendants relied upon a report that indicates the acts complained of occurred on July 4, 2008. The court finds that, regardless of the date, the testimony refers to only one incident that occurred on a Friday in July 2008, be it the 4th or the 25th, and the fact that the date is in dispute is irrelevant. (D.I. 95 at 221:5-25)

and was deployed as backup patrol on the date in question. (D.I. 94 at 131:15-25, 167:11-16)

3. Defendant Kimberly Pfaff (née Donahue) ("Pfaff") was employed by the Wilmington Police Department on the date in question and is currently a senior corporal in the department. (D.I. 95 at 180:8-16)

### B. The Alarm

4. A residential burglar alarm, monitored by Tri-State Alarm Company, activated the front door at 608 W. 9th Street on the date in question. (D.I. 94 at 85:18-20, 172:10-12; D.I. 95 at 184:3-6)

5. Plaintiff, who was asleep in a third floor bedroom, walked to the first floor, deactivated the alarm, and returned to bed. (D.I. 94 at 85:20-23, 86:1-2, 88:1-2) The monitoring station called both the police department and plaintiff, and plaintiff advised the monitoring station that it was a false alarm. (D.I. 94 at 86:2-4; D.I. 95 at 184:14-18) The monitoring station indicated to plaintiff that it would call the property owner, Howard A. Sudler, Jr. ("Sudler"). (D.I. 94 at 86:7-8)

6. Plaintiff also called Sudler, who advised plaintiff that he would contact Michele Green ("Green"), another individual who lived in the property. (D.I. 94 at 86:10, 21-23) Green called plaintiff and told him that she was in the house, but was leaving because she had a capias and a police car was coming down the street and she was worried she would be arrested. (*Id.* at 87:1, 7-9) Plaintiff told Green to lock the door and close it. (*Id.* at 87:13-14) Plaintiff again returned to bed. (*Id.* at 87:19)

2

### C. Search of the Premises

7. Riley, Pfaff, and Wilmington Police Officer Scott Gula ("Gula") responded to the activated alarm at 608 W. 9th Street to conduct a property check. (D.I. 94 at 50:10-13, 132:9-11, 140:8-10, 141:15; D.I. 95 at 185:8-9, 186:15-16) Riley, who was by himself, was the first to arrive, followed by partners Pfaff and Gula. (D.I. 94 at 53:8-13, 142:2, 11-12) Gula does not recall being present and could not give any details of his response to the alarm. (*Id.* at 58:12-15)

8. When Riley arrived, the front door was open which suggested a possible burglary in progress and that the suspect could be inside the premises. (D.I. 94 at 142:3-9; D.I. 95 at 187:4-6) He advised Pfaff and Gula that the residence would be searched due to the open door. (D.I. 94 at 142:11-13) The police officers stayed together and conducted a slow, methodical search of the entire residence, called "clearing the house," looking for a suspect, signs of a burglary, and/or threats to determine whether a crime was committed. (D.I. 94 at 156:21-25, 157:1-6, 158:12, 160:20; D.I. 95 at 187:8-11)

9. The premises has three floors and nothing suspicious was found on the first two floors. (D.I. 94 at 143:2-5) On the third floor, the officers searched the rooms that were open and unlocked and came to a room with a locked door. (*Id.* at 143:15-21) It was the only secured door in the residence. (*Id.* at 143:22-24)

10. Plaintiff, who was awakened from his sleep, heard footsteps and quiet radio chatter in the third floor hallway. (*Id.* at 87:22-24, 88:9-10) He recognized the dispatcher and presumed it was either the police or security personnel. (*Id.* at 111:8-16, 111:22) He did not announce himself. (*Id.* at 88:15-16) While the police were in the

3

third floor area, plaintiff got out of bed, activated a video camera, and returned to bed. (*Id.* at 116:17-22, 117:8-13) Plaintiff was nude, but did not put on his clothes at that time. (*Id.* at 117:14-19)

### D. Search of the Third Floor Bedroom

11. As plaintiff's bedroom door was locked, the police knocked and announced themselves. There was no response. The police opened the door either by force or manipulating the lock, and uniformed police officers entered the room with guns drawn stating, "hands, hands." (D.I. 94 at 88:21-25, 110:19-21, 143:1-3, 13-14; D.I. 95 at 189:9-12, 22-24, 205:7-21) According to defendants, when they entered the room, they were unable to see plaintiff's hands because he was covered with a blanket, and plaintiff did not comply with an order to show his hands. (D.I. 94 at 145:1-11; D.I. 95 at 190:2-4, 7-9) Plaintiff, who was nude and lying on a mattress under the covers, testified that he showed his hands. (D.I. 94 at 89:7; 100:17) One of the officers removed the blanket from plaintiff and found him naked. (D.I. 94 at 145:13; D.I. 95 at 190:11-14)

12. Plaintiff and Riley recognized each other from plaintiff's appearances in court as a bail bondsman. (D.I. 94 at 89:11, 145:21-25, 146:1-2) Pfaff also recognized plaintiff as a bail bondsman, and she stated to the other officers, "he's a bail bondsman." (D.I. 94 at 89:15-16; D.I. 95 at 190:22-25, 190:1-3, 11-13, 199:20-25, 200:1-6) Pfaff hoped that by informing the other officers that plaintiff was a bail bondsman, plaintiff would recognize Pfaff and it would compel him to be a little more cooperative so the matter would resolve quickly. (D.I. 95 at 220:10-15) Neither Riley nor Pfaff knew plaintiff's name or where plaintiff lived. (D.I. 94 at 146:3-6; D.I. 95 at 191:4-8)

4

### E. Identification of Plaintiff

13. Plaintiff testified that police officers asked his name twice, that he was asked for identification, and that he provided both. (D.I. 94 at 90:8-9, 14-15, 24-25, 119:24-120) Riley also asked plaintiff his name but, because it was the third time plaintiff had been asked the question, he did not respond and, in turn, Riley asked plaintiff if he wanted to be arrested. (Id. at 94:19-20, 121:17-19, 146:12-16) Riley testified that, at that point, plaintiff could have been arrested because his identity was unknown, it was unknown why he was in the residence, and it was assumed that he was a burglar. (D.I. 94 at 146:17-22; D.I. 95 at 191:23-25; 192:1-4) However, Riley did not arrest plaintiff because he recognized plaintiff as a bail bondsman and, because plaintiff was naked, he thought the incident might be handled by finding out his name, if he lived there, or what purpose he had there. (D.I. 94 at 146:23-25, 147:1-5) In addition, not arresting plaintiff resulted in an easier investigative process, taking less time than had plaintiff been arrested and taken to the police station. (D.I. 94 at 172:13-20; D.I. 95 at 192:6-12)

14. According to plaintiff, Riley knocked him to the ground and pushed his elbow into plaintiff's neck. (D.I. 94 at 94:17-23;127:4-140) Plaintiff never sought any medical treatment as a result of the incident. (D.I. 94 at 1274-140) Riley denies touching, striking or assaulting plaintiff, and Pfaff did not see Riley strike or assault plaintiff. (D.I. 94 at 149:1-5; D.I. 95 at 195:18-19) When force is used, it prompts a use-of-force investigation by the Wilmington Police Department. (D.I. 94 at 1511-9) A citizen complaint can also prompt a use-of-force investigation. (Id. at 151:10-15) Riley was not notified of a use-of-force investigation, but this did not surprise him because "there [was] no use of force." (Id. at 151:16-22)

5

15. According to Pfaff, plaintiff was asked his identity, but refused to cooperate. (D.I. 95 at 191:17-22) Pfaff either picked plaintiff's wallet[3] off the floor or it was handed to her by a fellow officer, and she searched it and found within it a license or identification of plaintiff. (D.I. 95 at 192:18-25, 193:1-4, 200:10-13; 202:9-11) Plaintiff testified that Pfaff grabbed plaintiff's business card holder which contained "personal things" and "started flicking" all of the cards onto the floor. (D.I. 94 at 92:22-25, 93:1-5, 11) Riley did not see Pfaff conduct a search of plaintiff's business card holder or throw plaintiff's business cards on the floor. (Id. at 148:17-25) Riley did not recall what type of identification plaintiff provided as Riley did not obtain identification from plaintiff. (Id. at 163:1, 170:12-13, 17-18)

16. Plaintiff called the owner of the property and asked him to tell the police that he belonged on the premises. (Id. at 91:6-17) One of the police officers spoke to the owner of the property and was advised that plaintiff was a tenant and rightfully in the residence. (D.I. 94 at 91:16-19, 23-25; D.I. 95 at 193:14-23)

17. Gula took plaintiff's license, ran a DELJIS[4] check and verified that plaintiff did not have any outstanding warrants. (D.I. 94 at 91:16-19, 23-25; D.I. 95 at 193:8-13) Another officer went next door to corroborate that plaintiff lived at 608 West 9th Street. (D.I. 94 at 92:12-17) This was done because the police still did not have an address for

---

[3]Plaintiff does not carry a wallet, he carries a "business card holder." Hereafter, the court will use "business card holder" to describe the item. (D.I. 94 at 92:24, 93:1-13)

[4]Contained within the Delaware Criminal Justice Information System, it is an intranet accessible version of charge summary, which includes links to warrant documents, police complaints, offender profiles, offender mugshots and DMV photos. http://deljis.delaware.gov/whatwedo.shtml. A name and date of birth is required for a DELJIS search. (D.I. 94 at 163:9)

6

plaintiff and they were exhausting other techniques to prove that plaintiff lived at 608 West 9th Street. (*Id.* at 174:8-12) The officer who went next door corroborated that plaintiff lived at the premises. (*Id.* at 93:20-21) According to Pfaff, she did not search plaintiff's business card holder once plaintiff was identified and it was determined that he was lawfully on the premises. (D.I. 95 at 195:7-11)

18. Plaintiff testified that he was naked the entire time and asked to get dressed three times, but was ignored and received no response. (D.I. 94 at 89:19-22) Riley testified that at some point plaintiff was allowed to get dressed, but he does not remember "exactly when." (*Id.* at 145:18-20, 164:1-4) Pfaff testified that plaintiff was allowed to dress and that she never allows a suspect to remain naked while conducting an investigation. (D.I. 95 at 190:15-21) She recalled leaving the room so plaintiff could dress. (*Id.* at 204:14-16)

19. Plaintiff was not aware that he was a suspect because he thought that Riley and Pfaff knew him. (D.I. 94 at 122:7-11, 123:24-25, 124:1-12) According to plaintiff, after his identity was verified and it was determined and he was rightfully in the house, he put on his clothes that were lying next to the mattress, told the officers to get out, and yelled profanities at them. (*Id.* at 95:21-23, 96:2-3, 124:13-15) The police cleared the scene, and plaintiff was not arrested once police discovered who he was, that he lived on the premises, and that there were no outstanding warrants for his arrest. (D.I. 94 at 141:1-3, 148:8-10, 174:1; D.I. 95 at 185:10; 194:20) The officers did not complete a police report or incident report because it was a simple investigation and there was no arrest or anything that would cause the generation of a report. (D.I. 94 at 148:3-13; D.I. 95 at 194:23-25, 195:1-6)

7

20. Plaintiff called the non-emergency telephone number of the Wilmington Police Department and complained, but he did not file a complaint with the Office of Professional Standards. (D.I. 94 at 96:16-17, 126:24-25, 127:1-3)

## III. CONCLUSIONS OF LAW

21. Plaintiff bears the burden of proof on the elements of a § 1983 claim by a preponderance of the evidence. *See, e.g., Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Plaintiff must prove that, in light of all the evidence, his claims are more likely so than not so.

### A. Search of the Residence and the Locked Room

22. "[T]he Fourth Amendment protects two types of expectations, one involving searches, and the other seizures. A search occurs when an individual's reasonable expectation of privacy is infringed. A seizure of property occurs where there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty.*, 506 U.S. 56, 63 (1992) (internal quotations and citations omitted). It is a basic principle of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted). "[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."[5] *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978). Regardless of

---

[5]Exigent circumstances exist where "officers reasonably . . . believe that someone is in imminent danger." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996).

8

whether an exception applies, a warrantless search generally must be supported by probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).

23. The facts support a finding that exigent circumstances established probable cause for the warrantless entry into the residence on 9th Street as well as into the locked bedroom on the third floor. The burglar alarm was triggered, the monitoring company called the police, and when the police arrived the front door was open. No one appeared or responded to the police when they announced their presence while the premises were searched. Plaintiff remained behind a locked door, the only one in the house and, even though he heard the police, he did not make his presence known. It was reasonable to assume a burglar remained behind the locked door. These circumstances establish probable cause to believe a burglary was in progress and justified the warrantless entry into the house and into the locked bedroom on the third floor. *See, e.g., United States v. Brown*, 449 F.3d 741 (6th Cir. 2006) (upholding warrantless entry where officer responded to activation of home security system); *United States v. Dighera*, 2 F. Supp. 2d 1377, 1380 (D. Kan. 1998) (officers acted reasonably in entering the residence and searching for possible intruders or injured or incapacitated residents when security company notified the police that the alarm had been activated and officers found the front door open, there were no other apparent signs of a break-in, police received no response from inside the house and entered the house through the open door to investigate a possible burglary); *United States v. Porter*,

---

For example, a search may be justified based on exigent circumstances by "hot pursuit of a fleeing felon," "imminent destruction of evidence," or "the need to prevent a suspect's escape." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

9

288 F. Supp. 2d 716 (W.D. Va. 2003) (finding activation of alarm, no response to officer's knocking, and an unlocked rear door presented exigencies justifying warrantless entry into residence).

## B. Reasonableness of Seizure

24. The facts also support a finding that the manner in which plaintiff's seizure was conducted was reasonable despite the fact that plaintiff arguably remained nude during much of the time. The reasonableness of a seizure or a search receives special scrutiny when a suspect's constitutional right to bodily privacy is implicated. *See, e.g., Whren v. United States*, 517 U.S. 806, 818 (1996) (explaining that while probable cause generally renders searches and seizures reasonable, special balancing analysis needed when seizure or search is "conducted in an extraordinary manner, unusually harmful to an individual's privacy or . . . physical interests"). A detention "may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). However, courts have found no constitutional violation when a plaintiff was required to remain in a bathroom, naked, under the supervision of a female officer but within view of male officers, until a protective sweep of the house was completed. See *Crosby v. Hare*, 932 F. Supp. 490, 494-95 (W.D.N.Y. 1996); *see also Los Angeles County, California v. Rettele*, 550 U.S. 609, 614 (2007) (no Fourth Amendment violation where officers executed a warrant to search a home for suspects and temporarily detained the innocent occupants and ordered couple sleeping together in the nude out of bed at gunpoint).

25. In *Crosby*, the court relied on facts that the detention was of short duration, the detainee was somewhat shielded from public view, she was suspected of

10

committing the crimes underlying the search of the residence, and she was not made to strip but merely to remain naked until the sweep was completed. *Id.* at 495. The facts of this case are similar. Here, plaintiff was in the privacy of a residence away from public view, he was initially suspected of burglary, the police officers were lawfully in his home due to exigent circumstances, plaintiff was not required to strip but remained naked until the officers determined his identification and whether he was lawfully in the residence, all of which took a very short period of time.

### C. Investigation of Identity

26. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Once a law enforcement officer has detained a suspect based upon reasonable suspicion, the officer must only engage in activities calculated to confirm or dispel his or her suspicion. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

27. Based on the triggered burglar alarm, the open door, the locked door on the third floor, and that plaintiff was the only person in the building on 9th Street, the court finds that the request for plaintiff's identification and verification that he was rightfully in the building was objectively reasonable. In addition, even considering that Pfaff may have rifled through plaintiff's business card holder, there was no violation of plaintiff's constitutional rights.

28. As noted by the Supreme Court in a slightly different context, "[a]sking questions is an essential part of police investigations. In the ordinary course a police

11

officer is free to ask a person for identification without implicating the Fourth Amendment. 'Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.'" *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 185 (2004) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984)). "[T]he ability to briefly stop a [suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *Id.* at 186 (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)). "Obtaining a suspect's name in the course of a[n investigatory] stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere." *Id.* Here, plaintiff's identity was necessary and seizing the business card holder in order to ascertain his identity was reasonable in light of all known circumstances. *See e.g., Batch v. Geagan*, 2013 WL 3147261, at *12 (W.D. Pa. June 19, 2013) (pat down of suspect and seizure of identification card under the circumstances was eminently reasonable).

29. Even had Pfaff's seizure of plaintiff's business card holder implicated the Fourth Amendment, Pfaff would, nonetheless, be entitled to qualified immunity. Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S.Ct. 2074, 2080 (2011). "A right is clearly established for purposes of qualified immunity when its

12

contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A defendant, however, is protected from liability if he or she acts on the basis of a reasonable mistake of fact or law. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 131 S.Ct. at 2085.

30. Even if the law could be construed so as to implicate Pfaff in a Fourth Amendment violation, her conduct falls squarely within the parameters of qualified immunity. The court is convinced that a reasonable officer on the scene, knowing what she knew at the time, could have believed that she was justified in rifling through plaintiff's business card holder that had been handed to her, in an effort to determine plaintiff's identity, if he was lawfully on the premises, or if he had committed a crime.

**D. Excessive Force and Assault**

31. Plaintiff's final § 1983 claim is for excessive force against Riley in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The use of excessive force is itself an unlawful seizure under the Fourth Amendment. *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006). In addition, plaintiff raises a supplemental claim of assault. Under Delaware law, an assault is the attempt by a person, in a rude and revengeful manner, to do an injury to another person, coupled with the present ability to do it. *Lloyd v. Jefferson*, 53 F. Supp. 2d 643, 672 (D. Del. 1999).

13

32. "[C]laims that law enforcement officers have used excessive force . . . in the course of an . . . investigatory stop . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004); *Mosley v. Wilson*, 102 F.3d 85, 95 (3d Cir. 1996). The reasonableness of the officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. It is well-established that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Graham*, 490 U.S. at 396 (citation omitted). Under the law of the Third Circuit, the minor degree of a plaintiff's injury, while relevant to the totality of the circumstances, cannot on its own serve as a complete defense to an excessive force claim. *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002).

33. To determine whether the challenged conduct constitutes excessive force, the court determine the objective reasonableness of the challenged conduct in light of the facts and circumstances of the particular case, the severity of the crime, whether plaintiff posed an immediate threat to the safety of the officers or others, and whether plaintiff actively resisted arrest or attempted to evade arrest by flight. *See Graham*, 490

14

U.S. at 396. Other relevant factors considered include whether the physical force applied was of such an extent as to lead to injury, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the police officers' action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005).

34. Plaintiff testified that force was used after he refused to answer Riley's question about his identity. Riley flatly denies that he touched plaintiff. The court finds plaintiff failed to meet his burden of proof on the issue that it is more likely than not that Riley used excessive force. There is no evidence of any injury to plaintiff and plaintiff did not seek medical attention. Nor was there a use-of-force investigation which is standard procedure when force is used by police officers. Finally, plaintiff testified that he did not seek medical attention and did not file a citizen's complaint regarding Riley's actions.

35. With regard to Riley's threat of arrest, this occurred after plaintiff refused to provide to Riley his name. While plaintiff testified that he had twice provided his name to police officers, there is no evidence that he provided it to Riley. Indeed, the record is clear that plaintiff refused to cooperate with Riley. Hence Riley's threat of arrest was not unreasonable. *See Shuey v. Schwab*, 2010 WL 479938 at *4 (M.D. Pa. Feb. 4, 2010) (alleged threats to arrest plaintiff, standing alone, could not support a claim of excessive force); *Page v. Forry*, 2009 WL 3109828 at *2 (D. Del. Sept. 29, 2009) (verbal abuse and harassment did not rise to the level of a constitutional violation); *United*

15

States v. Buehler, 793 F. Supp. 971, 975-76 (E.D. Wash. 1992) (fisherman who refused to provide identification was guilty of interfering with park ranger's authority to issue citation.) After careful review of the facts, the court concludes that plaintiff failed to meet his burden to prove an assault or excessive force occurred on the July evening in question.

## IV. CONCLUSION

36. For the foregoing reasons, the court finds that plaintiff did not meet his burden to provide that defendants violated his constitutional rights or that Riley assaulted plaintiff.

An appropriate order shall issue.